# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

SAMUEL KO,
       Plaintiff

   v.

ALEJANDRO MAYORKAS,
       Defendant

No. 21 CV 6032

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by the defendant, Alejandro Mayorkas, the Secretary of the Department of Homeland Security ("DHS"). (R. 25.)[1] After being suspended for five days without pay, the plaintiff, Samuel Ko, a supervisory U.S. Customs and Border Protection ("CBP") officer ("CBPO"), filed suit alleging that he was punished more harshly than other similarly situated employees because of his race. (R. 1.) For the reasons explained herein, the motion is granted.

## BACKGROUND[2]

Ko is Korean American. (R. 34 ("Pl.'s Resp. to Def.'s SOF") ¶ 3.) He has worked with CBP for over thirty-two years, and, in March 2003, he was promoted to his

---

[1] For CM/ECF filings, the Court cites to the page number(s) set forth in the document's CM/ECF header unless citing to a particular paragraph or other page designation is more appropriate.

[2] The Court takes the following facts from the parties' Local Rule 56.1 submissions, the materials cited therein, and other aspects of the record in this case. All facts are genuinely undisputed unless otherwise noted. Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3).

current role as a supervisory CBPO. (*Id.*) CBP is the agency within DHS responsible for facilitating lawful international travel and trade. (*Id.* ¶ 8.)

In 2016, Ko was working at the International Port of Entry at O'Hare International Airport in Chicago, Illinois. (R. 41 ("Def's Resp. to Pl.'s SOAF") ¶ 5.) At the time, he was one of a few Asian Americans and the only Korean American employed by CBP in a supervisory role at O'Hare. (Pl.'s Resp. to Def.'s SOF ¶ 3.) Ko's responsibilities included providing technical advice to officers. (*Id.* ¶ 9.) He was also "directly accountable for any incidents, actions, and other activities that might occur at the Port." (*Id.*)

On February 13, 2016, a Laotian citizen who was traveling to Minneapolis, Minnesota via O'Hare, was referred for secondary inspection after a CBPO noted an alert about her in the CBP database, known as a Treasury Enforcement Communications Systems ("TECS") alert. (*Id.* ¶¶ 11, 15, 26-27) Ko was the supervisory CBPO for secondary inspections that day and he was overseeing CBPOs Sara Fraser and Giovanny Murillo. (*Id.* ¶¶ 13, 14, 17.) Upon reviewing the TECS alert, Ko learned that she was a suspected member of an opium smuggling ring and had previously attempted to smuggle seventeen kilos of opium into the United States inside of bags of coffee and tea. (*Id.* ¶ 12.)

The agents did not perform a pat-down search of the passenger. The parties dispute the reasons for this. Fraser and Murillo said that they felt Ko discouraged them from escalating the search. (*Id.* ¶¶ 24, 30.) Ko denies doing so. Specifically, Fraser says that she asked Ko if "he would approve a pat-down for contraband given

the nature of the passenger's prior history," (for which Ko's approval was required), but Ko told her that "he did not agree" to the pat down. (*Id.* ¶ 16.) Murillo said that Ko told him that "Fraser wants to do a pat down, but she has nothing." (*Id.* ¶ 24.) Ko agrees that Fraser asked for a pat down, however, he asserts that he did not say it was not warranted, only that, "if you're asking for it, I'll approve it." (*Id.* ¶ 16.) Ultimately, Fraser did not do a pat-down, and Ko, Murillo, and Fraser each searched the passenger's luggage. (*Id.* ¶¶ 16-18.)

Fraser and Murillo's searches revealed plastic bundles containing tea leaves and brown powder. (*Id.* ¶ 21.) Murillo says he then asked Ko what opium looked like because the passenger had a lot of brown powder, and Ko responded that "[i]t's a gel so don't worry about it." (*Id.* ¶ 22.) The parties agree that Ko's response was incorrect because while opium can be in liquid, solid, or powder, it can appear in a fine brownish powder. (*Id.*) Ko, for his part, denies ever seeing brown powder, but agrees that he saw tea leaves. (*Id.* ¶¶ 21, 36.) Murillo repacked the passenger's luggage and Fraser released her from the inspection area. (*Id.* ¶ 25.)

Two hours later, Fraser learned that there had been an opium seizure involving another female passenger traveling at O'Hare from Laos. (*Id.* ¶ 26.) This prompted Fraser to go to the inspection area where she observed plastic bags containing a brown substance and bags of dried leaves, which "were identical" to what she observed during the earlier inspection. (*Id.*) The information was relayed to CBP employees in Minneapolis, who contacted the Minneapolis Police Department. (*Id.* ¶ 27.) Later that day, the passenger that Ko's team released was detained by local police

after arriving in Minneapolis. (*Id.*) The 9.044 kilograms of brown substance in her possession was seized and tested positive for opium. (*Id.* ¶ 27.)

Afterwards, CBP investigated the security breakdown that led to the opium passing through the inspection area. (*Id.* ¶ 28.) One of Ko supervisors, CBP Watch Commander Brian Henke, collected statements from Ko, Murillo, and Fraser. (*Id.*) Murillo and Fraser reported that Ko had dissuaded them from performing their duties. (*Id.* ¶¶ 24, 30.) Ko admitted that he "provid[ed] bad advice to the officers" and was "perhaps guilty of trying to read too deeply into the TECS lookouts." (*Id.* ¶ 29.) On May 13, 2016, Assistant Area Port Director Michael Pfeiffer issued Ko a letter that proposed five days suspension without pay for negligent performance of duty. (*Id.* ¶ 35.) The letter stated that several aggravating factors supported the decision, including Ko's supervisory role and his own admission that he should have instructed the officers to conduct a more complete bag search. (*Id.* ¶¶ 35-36.) A final letter imposing the five days suspension without pay was issued to Ko on July 11, 2016, from his most senior supervisor, Area Port Director Matthew Davies. (*Id.* ¶¶ 5, 38.)

After exhausting administrative remedies by filing a complaint to the Equal Employment Opportunity Commission and receiving a notice of right to suit, Ko filed suit for race discrimination in employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a). (R. 1-1 at 1-3.) The defendant has filed a motion for summary judgment. (R. 25.)

**LEGAL STANDARD**

"Summary judgment is warranted if the evidence, when viewed in the light most favorable to the non-moving party, presents 'no genuine issue as to any material

4

fact' such that 'the moving party is entitled to a judgment as a matter of law.'" *Orton-Bell v. Indiana*, 759 F.3d 768, 772-73 (7th Cir. 2014) (citing Fed. R. Civ. P. 56(c)). "A fact is 'material' if it is one identified by the law as affecting the outcome of the case." *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 722 (7th Cir. 2015). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reaching its decision, the Court "may not assess the credibility of witnesses, choose between competing inferences[,] or balance the relative weight of conflicting evidence." *Orton-Bell*, 759 F.3d at 773. Rather, the Court must "give the non-moving party the benefit of conflicts in the evidence and of any inferences in his favor that might reasonably be drawn from the evidence." *Lane v. Riverview Hosp.*, 835 F.3d 691, 694 (7th Cir. 2016).

## ANALYSIS

### I. TITLE VII RACE DISCRIMINATION

"Title VII forbids an employer to '. . . discriminate against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's . . . [race].'" *Orton-Bell*, 759 F.3d 777 (quoting 42 U.S.C. § 2000e–2). The issue at summary judgment is whether there is "evidence [that] would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

"To establish a *prima facie* case, [Ko] must establish that '(1) [he] is a member of a protected class, (2) [his] job performance met [his] employer's] legitimate

5

expectations, (3) [he] suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff.'" *Orton-Bell*, 759 F.3d 777 (quoting *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750-51 (7th Cir. 2006)). "If any one of the elements of the plaintiff's *prima facie* case is lacking, the plaintiff loses." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 642 (7th Cir. 2013). Here, Ko argues that a reasonable factfinder would conclude there is supporting evidence for each element of his *prima facie* case. (R. 36-1 at 16.) The parties do not dispute that Ko, as a Korean American, is a member of a protected class and that his five-day suspension without pay constituted an adverse employment action. The Court thus analyzes only whether there is evidence from which a reasonable jury could conclude that Ko, first, was treated less favorably than a similarly situated individual, and second, that his performance satisfied his employer's legitimate expectations.

### A. Similarly Situated Employees

"In general, a plaintiff who believes another individual is 'similarly situated' must at least show that this 'comparator' (1) 'dealt with the same supervisor,' (2) 'w[as] subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him].'" *Orton-Bell*, 759 F.3d at 777 (citation omitted); *see Atanus v. Perry*, 520 F.3d 662, 673 (7th Cir. 2008) ("[A] plaintiff must show that members of the comparative group are 'directly comparable to her in all material respects.'"). Said differently, the issue is "whether the situations are similar enough, apart from the employees' races, to provide support for a reasonable inference of

6

discrimination." *Lane*, 835 F.3d at 695. "[T]his prong ought not be applied in an 'unduly rigid' or 'narrow[ ]' manner,'" *Atanus*, 520 F.3d at 673 (citations omitted), rather, "judging comparators is a common-sense inquiry[.]" *Orton-Bell*, 759 F.3d at 777.

### 1. Glen Zayner

Ko begins by identifying a Caucasian male, supervisory CBPO, Glen Zayner as a comparator. (R. 36-1 at 17.) Zayner violated CBP policy when he allowed an inadmissible non-citizen at O'Hare to meet with his family before being removed and also left a CBP officer alone with the family and the non-citizen. (Pl.'s Resp. to Def.'s SOF ¶ 44.) For this, Pfeiffer proposed to suspend Zayner for fourteen days for neglect of duty and failing to follow CBP procedures. (*Id.*) Zayner also simultaneously had another case pending before CBP's Merit Systems Protection Board. (*Id.*) In the context of global settlement negotiations regarding Zayner's cases, Executive Director of Mission Support, Mary Jo Heberle decided to mitigate Pfeiffer's recommended penalty to a letter of reprimand. (*Id.*) Further, Ko's supervisors repeatedly testified that they were not involved in Heberle's decision. (*Id.*; Def's Resp. to Pl.'s SOAF ¶¶ 6-7.)

Ko and Zayner are not similarly situated. First, Ko and Zayner did not violate similar policies. Although both were deemed negligent in their duty, the policy Ko violated involved preventing the admission of contraband and there is no evidence showing that Zayner allowed any prohibited person or contraband into the country. Also, despite Ko's assertion to the contrary, (R. 36-1 at 16-17), Pfeiffer's initial recommendation does not help Ko; rather, it shows that him and Zayner had

7

dissimilar misconduct, since Ko received a much lesser penalty for his neglect of duty. Heberle's decision to mitigate Pfeiffer's recommended penalty to a letter of reprimand, moreover, presents distinguishing circumstances. That decision did not involve Ko's supervisors and thus likely involved the consideration of factors not at play in the decision to suspend Ko. Because the comparator analysis is not a rigid, but a common-sense inquiry, these distinguishing characteristics are sufficient for this Court to exclude Zayner as similarly situated to Ko.

Nevertheless, analogizing his case to *Lane*, Ko argues that a jury could conclude that his supervisors had knowledge of Heberle's decision and if they had disagreed, they had authority to push for a different result. (R. 36-1 at 18-19.) In *Lane*, the plaintiff sought to rely upon a comparator who was disciplined by a different individual for violating the same policy as the plaintiff. 835 F.3d at 696. The Seventh Circuit disagreed with the district court's decision rejecting the comparator. *Id*. Although the comparator's case involved a different decision-maker, the plaintiff's decision-maker "was at least informed about the decision/recommendation not to discipline him." *Id*. The court allowed the comparator because there was evidence that if she wished, the plaintiff's decision-maker had the authority to step in and push for a different response in the comparator's case. *Id*.

This case is readily distinguishable. Ko's theory is belied by the evidence, which shows that Ko's supervisors only learned about the decision to issue a letter of reprimand *after* it was made. (Def's Resp. to Pl.'s SOAF ¶¶ 6-7.) Pfeiffer testified that he learned of the settlement during a call with CBP's Office of Chief Counsel, during

8

which he was told that a settlement was "forthcoming." (*Id.* ¶ 6.) Pfeiffer also never spoke with Heberle prior to the disciplinary recommendation being downgraded. (*Id.*)

Ko further claims that Davies was "vague" about whether Davies' input could have been allowed. (R. 36-1 at 18.) Ko cites to when Davies was asked during his deposition about whether he inquired about the reasons for Heberle's decision and he responded that he had no reason to. (*Id.*) This statement is not vague at all when viewed in context of his earlier testimony that the decision was made entirely without his input:

> I was not involved in the decision for why or under what circumstances his proposed 14-day suspension was mitigated. I was made aware that the agency had entered into a settlement agreement and that a letter of reprimand was to be issued as a result of that case, that that was part of the settlement agreement.

(R. 26-2 at 84.) Ko cites no evidence that shows that Davies or any of his supervisors could have impacted Heberle's decision (let alone knew of it before the decision was made), and Ko's claim that they could amounts to nothing more than mere speculation, which cannot create an issue of fact to survive summary judgement. *See Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014). For all of these reasons, Zayner is an inapt comparator.

### 2. Tomica Craig and Mona Burwell

Ko next identifies two Black women as comparators, supervisory CBPOs Tomica Craig and Mona Burwell. (R. 36-1 at 19-21.) Craig and Burwell were responsible for an individual who claimed a credible fear of persecution from their home country being removed without first being referred to ICE for an interview.

9

(Pl.'s Resp. to Def.'s SOF ¶¶ 45-52; Def's Resp. to Pl.'s SOAF ¶¶ 14-15.) In response to the Craig and Burwell incident, an Operational Review ("OR") team was formed to determine whether anyone was at fault for the incident, to investigate what went wrong with currently established processes, and how to prevent the issue from reoccurring. (Pl.'s Resp. to Def.'s SOF ¶ 53.)

The Court is not convinced that the Craig and Burwell incident involved similar misconduct. In one, an inadmissible individual was *not* admitted into the country, whereas Ko's mistake resulted in 9.044 kilograms of suspected opium being transported from Chicago to Minneapolis. (Pl.'s Resp. to Def.'s SOF ¶ 27.) Ko argues that the OR's team creation and its determination that no one was negligent is evidence supporting a reasonable inference of racially motivated treatment. (R. 36-1 at 19-21.) But the fact that the investigation found no wrongdoing makes Craig and Burwell improper comparators. Distinguishably, Ko was disciplined because an investigation concluded that he was negligent, in part, because of his own admission that he supplied bad advice. (Pl.'s Resp. to Def.'s SOF ¶ 29.) Another distinction is that the OR team was formed because the Craig and Burwell incident involved multiple shifts and miscommunications between many individuals, making it unclear what went wrong, whereas Ko's incident involved corroborating reports from the only other two officers involved and occurred during a single shift. (*Id.* ¶ 53; Def's Resp. to Pl.'s SOAF ¶¶ 14, 37.) Accordingly, in light of these distinguishing circumstances, Craig and Burwell are also not suitable comparators.

### 3. Mario Cornejo and Peter Manno

Ko next relies on Mario Cornejo and Peter Manno, Hispanic and Caucasian supervisory CBPOs, respectively, who were accused of sleeping on the job. (*Id.* ¶¶ 54-55.) The Court is not persuaded that Cornejo's incident, which did not occur at the O'Hare airport or result in contraband entering the country, involved similar misconduct. With respect to Watch Commander Peter Manno, Ko was unable to corroborate his allegation that Manno was never reprimanded for sleeping at work. (*Id.* ¶ 55.) Ko argues that he should be "afforded the opportunity to gather additional evidence before trial to establish Peter Manno as a proper comparator," in light of "the Defendant's pretextual explanations to defend its preferential treatment of Zayner, Craig, Burwell, and Cornejo[.]" (R. 36-1 at 21.) Because Ko has failed to establish that these individuals are suitable comparators, this request is denied. In conclusion, there is no evidence from which a reasonable jury could conclude that Ko was treated less favorably than a similarly situated individual.

### B. Legitimate Employment Expectations

Because Ko has failed on the final element of his *prima facie case*, it is not necessary for the Court to analyze whether he was meeting his employers' legitimate expectations. *Hobgood*, 731 F.3d at 642. In any event, the Court notes that summary judgement is also warranted because there is no evidence from which a reasonable juror could conclude that Ko was performing his job satisfactorily when he was suspended.

Rather, the uncontested facts show that Ko was negligent in failing to detect the 9.044 kilograms of suspected opium. As a supervisory CBPO, Ko was responsible

11

for advising and supervising other CBPOs and preventing the entry of unlawful drugs and contraband. (Pl.'s Resp. to Def.'s SOF ¶ 9.) On the day of the incident, Ko reviewed the passenger's TECS alert and saw that the passenger was a "member of an opium smuggling ring" and had previously smuggled seventeen kilos of opium within coffee and tea bags. (*Id.* ¶ 19.) While Ko asserts that he never saw the brown powder that Murillo and Fraser saw, he nevertheless admits that he observed numerous bundles of herbs inside of plastic bags, which looked like tea bags, inside the passenger's luggage. (*Id.*) Murillo also asked Ko what opium looked like, and he wrongly advised her that it came in a hard gel form, although it is undisputed that it usually appears in a fine brownish powder. (*Id.* ¶ 22.) Ko himself admitted that he "provid[ed] bad advice to the officers" and was "perhaps guilty of trying to read too deeply into the TECS lookouts." (*Id.* ¶ 37.) In light of these facts, no reasonable jury would conclude that Ko's had met his employer's legitimate expectations.

To avoid this conclusion, Ko argues that he was "improperly determined" to have made an error when contrasted to similarly situated employees. (R. 36-1 at 22.) But, as explained, there is no evidence that Ko was treated less favorably than similarly situated employees. To the extent Ko's argument could be interpreted to claim that that the determination that he was negligent was pretextual, *see, e.g.*, *Stringham v. Carmel Clay Sch.*, No. 22 C 817, 2024 WL 51185, at *13 (S.D. Ind. Jan. 4, 2024) (interpreting the plaintiff's argument that her "supervisors targeted and treated her differently than other counselors" "as argument that the documentary evidence, associated mostly with Cole, should be discredited as pretextual."), a

12

showing of pretext requires evidence that would support an inference that the reasons given for imposing the five-day suspension "1) had no basis in fact; 2) did not actually motivate [Ko's supervisor's] decision; or 3) was insufficient to motivate [their] decision." *Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002).

There is no such evidence in this case, however. The letter explaining the suspension cited several aggravating factors supporting the conclusion that Ko had been negligent in the performance of his duty, including his supervisory role and his own admission that he should have instructed the officers to conduct a more complete search. (Pl.'s Resp. to Def.'s SOF ¶ 36.) The fact that there were many reasons for the suspension also shows that Pfeiffer's decision was not exclusively grounded in Murrillo and Fraser's versions of events. (*See* R. 36-1 at 22.) But, even if Pfeiffer had solely relied on Murillo and Fraser's accounts, this would not show that Ko's discipline was pretextual. Reasonable managers could disagree whether Ko's version of events should control, but relying on the word of two officers whose separately authored accounts of the event corroborated each other was certainly a reasonable basis for the disciplinary action.

***

All said, Ko's theory of race discrimination simply does not present a genuine issue of material fact. Even when given the benefit of reasonable inferences in his favor, a reasonable jury could not find that Ko was discriminated against on the basis of his race because there is no evidence showing that he was treated worse than a

similarly situated individual or that he was performing to his employer's legitimate expectations.

## CONCLUSION

The defendant's motion for summary judgment is granted.

Date: 3/11/2024

JEREMY C. DANIEL
United States District Judge